United States Courts
Southern District of Texas
FILED

JUN 1 6 2016


David J. Bradley, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § | Criminal No. __16 CR 0260__ |
| v. | § § | |
| ERIC UGORJI, | § § | UNDER SEAL |
| Defendant. | § § | |

## INDICTMENT

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order.

The Grand Jury charges:

### General Allegations

At all times material to this Indictment, unless otherwise specified:

### The Medicare Program

1. The Medicare Program ("Medicare") was a federal healthcare program providing benefits to individuals who were over the age of 65 or disabled. Medicare was administered by the United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"). Individuals receiving benefits under Medicare were referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

3. "Part A" of the Medicare program covered certain eligible home-healthcare costs for medical services provided by a home healthcare agency ("HHA") to beneficiaries requiring home-health services because of an illness or disability causing them to be homebound. Payments for home-healthcare services were typically made directly to a HHA based on claims submitted to

the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiaries.

4. Physicians, clinics, and other healthcare providers, including HHAs that provided services to Medicare beneficiaries, were able to apply for and obtain a Medicare "provider number." A healthcare provider that was issued a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare identification number, the services that were performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other healthcare provider that ordered the services.

5. The Medicare program paid for home-health services only if the patient qualified for home-healthcare benefits. A patient qualified for home-healthcare benefits only if:

   a. the patient was confined to the home, also referred to as homebound;

   b. the patient was under the care of a physician who specifically determined there was a need for home healthcare and established the Plan of Care (or "POC"); and

   c. the determining physician signed a certification statement specifying that:

      i. the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy;

      ii. the beneficiary was confined to the home;

      iii. a POC for furnishing services was established and periodically reviewed; and

      iv. the services were furnished while the beneficiary was under the care of the physician who established the POC.

6. Medicare regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the HHA.

7. These medical records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the HHA.

8. Deligent Health Services Inc ("Deligent") was a Texas corporation doing business at 8323 Southwest Freeway, Suite 233, Houston, Texas 77074. Deligent submitted claims to Medicare for home-health services.

9. Preferred Health Services, Inc. ("Preferred") was a Texas corporation doing business at 8323 Southwest Freeway, Suite 771, Houston, Texas 77074. Preferred submitted claims to Medicare for home-health services.

10. Physician-1, a resident of Harris County, Texas, was a physician licensed by the State of Texas and was affiliated with Medical Clinic-1.

11. Physician-2 was a physician licensed by the State of Texas and was affiliated with Medical Clinic-1.

12. Defendant **ERIC UGORJI**, a resident of Fort Bend, was the CEO and Administrator of Deligent. **ERIC UGORJI** also served as the Director and Managing Employee of Preferred. **ERIC UGORJI** was a registered nurse.

## COUNT 1
### Conspiracy to Commit Healthcare Fraud
### (Violation of 18 U.S.C. § 1349)

13. Paragraphs 1 through 12 are re-alleged and incorporated by reference as if fully set forth herein.

14. From in or around August 2009 through in or around April 2016, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas, and elsewhere, defendant,

**ERIC UGORJI,**

did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1347, that is, to execute a scheme and artifice to defraud a healthcare benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said healthcare benefit program, in connection with the delivery of and payment for healthcare benefits, items, and services.

### Purpose of the Conspiracy

15. It was a purpose of the conspiracy for defendant **ERIC UGORJI**, and others known and unknown to the Grand Jury, to unlawfully enrich themselves by (a) submitting false and fraudulent claims to Medicare, (b) concealing the submission of false and fraudulent claims to Medicare and the receipt and transfer of proceeds from the fraud, and (c) diverting proceeds of the fraud for the personal use and benefit of Defendant and his co-conspirators.

## Manner and Means of the Conspiracy

16. Defendant **ERIC UGORJI** maintained a Medicare provider number, which Defendant **ERIC UGORJI** used to submit claims to Medicare for home-health services that were not medically necessary, not provided or both.

17. Defendant **ERIC UGORJI** and his co-conspirators would pay Southwest Total Medical Inc., dba Amex Medical Clinic and Rehab, ("Amex") in exchange for POCs from Physician-1 and Physician-2, respectively. In these POCs, Physician-1 would falsely certify that Medicare beneficiaries were under Physician-1's care, when in fact, they were not under Physician-1's care. Physician-1 would also falsely certify in these POCs that Medicare beneficiaries were home bound, when in fact, they were not home bound. In these POCs, Physician-2 would falsely certify that Medicare beneficiaries were under Physician-2's care, when in fact, they were not under Physician-2's care. Physician-2 would also falsely certify in these POCs that Medicare beneficiaries were home bound, when in fact, they were not home bound.

18. Defendant **ERIC UGORJI** would sign medical records falsely representing that Medicare beneficiaries qualified for home-health services, when those Medicare beneficiaries did not qualify for those services under Medicare.

19. Defendant **ERIC UGORJI** submitted and caused the submission of claims to Medicare through Deligent and Preferred for home-health services that were not medically necessary, not provided or both. Medicare paid Deligent and Preferred on those claims.

20. From in or around August 2009 through in or around March 2016, Deligent billed Medicare $6,615,412.93 for purported home-health services. Medicare paid $9,788,512.76 on those claims.

21. From in or around January 2010 through in or around April 2016, Preferred billed Medicare $6,129,371.24 for purported home-health services. Medicare paid $7,407,386.36 on those claims.

22. After Medicare deposited payments into the bank accounts of Deligent and Preferred, defendant **ERIC UGORJI** transferred proceeds of the fraud to himself and his co-conspirators.

All in violation of Title 18, United States Code, Section 1349.

## CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(7))

Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to defendant **ERIC UGORJI** that upon conviction, all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offense is subject to forfeiture.

### Money Judgment

23. Defendant **ERIC UGORJI** is notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture, which is approximately $17,195,899.12.

Substitute Assets

24. Defendant **ERIC UGORJI** is notified that if any of the forfeitable property, or any portion thereof, as a result of any act or omission of Defendant or his co-conspirators:

a. cannot be located upon the exercise of due diligence;

b. has been transferred, or sold to, or deposited with a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States to seek forfeiture of any other property of Defendant up to the total value of the property subject to forfeiture, pursuant to Title 21, United States Code, Section 853(p), incorporated by reference in Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

Original Signature on File
FOREPERSON

KENNETH MAGIDSON
UNITED STATES ATTORNEY

Scott P. Armstrong
TRIAL ATTORNEY
CRIMINAL DIVISION
FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE